UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

    Plaintiff,

v.                                       Criminal Case No. 08-20348

Malcolm Reid,
                                            Sean F. Cox
    Defendant.                     United States District Court Judge

_____/

## OPINION FINDING DEFENDANT TO HAVE VIOLATED
## THE CONDITIONS OF HIS SUPERVISED RELEASE

On December 15, 2017, the Court held a supervised release violation hearing in this case. For the reasons below, the Court concludes that the Government has established, by a preponderance of the evidence, that Defendant committed a Grade A, Grade B, and Grade C violation of supervised release.

**BACKGROUND**

Defendant Malcolm Reid previously pleaded guilty before this Court to possession with intent to distribute heroin, 21 U.S.C. § 841(a)(1), and felon in possession of a firearm, 18 U.S.C. § 922(g)(1). On March 5, 2009, the Court sentenced Defendant Malcolm Reid to 87 months in prison, followed by three years of supervised release (Doc. # 18). The Court imposed the standard conditions of supervision.

Defendant's supervised release began December 2, 2014 and was set to expire on December 1, 2017. On November 20, 2017, Defendant's probation officer filed a Petition for Warrant alleging that Defendant violated the following three conditions of supervised release:

(1) "Violation of Mandatory Condition: The Defendant shall not commit another federal,

state or local crime."

(2) "Violation of Mandatory Condition: The Defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon."

(3) "Violation of Standard Condition: "The Defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer."

The Court held an evidentiary hearing on December 15, 2017. The Government presented four witnesses: Beaumont Hospital security officer Stephen O'Shaughnessy, Detroit Police Corporal Paul Knapp, Detroit Police Investigator Latunya Moses, and Defendant's probation officer Dion Thomas. The Government also presented as exhibits three police reports and a videotaped interview of LaCreta Slaughter by Corporal Knapp. Defendant did not present witnesses but presented statements made by Defendant and Slaughter to police.

Having heard and observed the witness who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the exhibits submitted by the parties, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

During the evening of October 19, 2017, LaCreta Slaughter was visiting Defendant–her ex-boyfriend–at his home. When Slaughter rebuffed Defendant's inquiries about getting back together, an altercation ensued. Defendant pushed Slaughter to the ground and began stomping her with his foot and striking her in the head with a closed fist. He then grabbed a knife and

---

[1] To the extent that a finding of fact is more properly a conclusion of law, and the to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

brandished it, swinging it near and at Slaughter. Trying to protect herself, Slaughter attempted to grab or block the knife, resulting in a severe laceration to her right thumb.

Slaughter attempted to enter the living room, at which time Defendant, who had grabbed a gun, fired a shot in her general direction. Defendant followed Slaughter and began to stomp on her again. Eventually, Defendant ceased his attack and walked away, leaving the gun–a silver and black .40 caliber handgun–behind. Slaughter grabbed the gun and slid it under a couch in the living room. She then convinced Defendant to take her to Beaumont Hospital in Farmington Hills.

The two arrived at the hospital around midnight. Upon arrival, they encountered security officer Stephen O'Shaughnessy. Defendant told him that Slaughter cut her hand while cutting vegetables. At the same time, Slaughter covertly pointed to Defendant, indicating that he was the perpetrator. Hospital employees took Slaughter to a triage room and Defendant left the hospital. Once separated from Defendant, Slaughter began shaking and crying and stated that Defendant had attacked her with a knife and shot a gun in her general direction. She also stated that she had hid the firearm under a couch.

Hospital employees contacted the Detroit Police Department. Corporal Paul Knapp and Officer David Denlar responded to the call shortly after midnight. The officers observed a severe laceration on Slaughter's right thumb and cuts and bruising on her face. When they interviewed Slaughter, she recounted how Defendant struck and stomped on her, slashed her with a knife, and fired a gun at her. During this interview, Defendant called Slaughter's cellphone several times. Slaughter told Defendant that he needed help because he was so violent. Defendant told her to stop talking like that in front of the nurses. Slaughter eventually

3

asked Defendant to return to the hospital to pick her up. The officers arrested Defendant when he returned.

Defendant attacks Slaughter's statements to O'Shaughnessy and the officers as incredible and unreliable, identifying differences between these statements and those made in a later interview with Investigator Moses. But Slaughter's description of events remained mostly constant throughout the day. She consistently described Defendant kicking and punching her, wielding and brandishing a knife, and possessing and firing a gun. This consistency, corroborated by her visible injuries and the recovery of a firearm and shell casing from Defendant's home, leads the Court to conclude that Slaughter's description of events is sufficiently reliable. *See United States v. Dobson*, 529 Fed. App'x. 536, 539 (6th Cir. 2013) ("A factfinder could plausibly conclude that Click's hospital statement, bolstered by other corroborating evidence present here, was sufficiently reliable . . . ."); *United States v. Williams*, 214 Fed. App'x. 552, 555 (6th Cir. 2007); ("It is well-settled that hearsay may be considered in a supervised release revocation hearing if it is shown to be reliable.").

It is instead Defendant's account of events that the Court finds is not credible. After he was arrested, Defendant provided a statement to police. He claimed that he did not hit or strike, attempt to stab, or fire a gun at Slaughter. He denied possessing a handgun at all. Defendant stated that Slaughter cut her hand when she grabbed a knife by the tip and he grabbed it by the handle to get it away from her. But this account differed drastically from Defendant's initial story that Slaughter hurt herself cutting vegetables. And Defendant's claims that he did not strike or stomp Slaughter are belied by the observable cuts and bruises on Slaughter's face.

Similarly, Defendant's claim that he did not possess or fire a gun are contradicted by the

4

physical evidence. After Defendant was arrested, the Detroit Police Department obtained a search warrant for Defendant's home. The search recovered a loaded black and silver .40 caliber Smith & Wesson handgun from under a couch, .40 caliber ammunition, a spent .40 caliber casing on the bedroom floor, and documents indicating that the house was Defendant's residence. During the search Investigator Moses also observed blood in the bedroom and living room.[2]

That same day, Moses interviewed Slaughter over the phone. Slaughter recounted that Defendant hit her repeatedly and kicked her several times. He then ran to the kitchen and grabbed a knife. While he was brandishing it, Slaughter grabbed the knife by the blade, cutting her thumb. She stated that Defendant then grabbed a gun from the bedroom and put it to his head, threatening to kill himself. After trying to convince him to put the gun down, Slaughter walked to the living room and, while her back was turned, heard a gunshot. She turned around and saw Defendant lying on the bed. She slid the gun out of his hand and hid it under the couch.

Although Slaughter's statement to Moses is mostly consistent with Slaughter's previous accounts, her description of Defendant's discharge of the firearm differs. She initially told O'Shaughnessy and Knapp that Defendant had shot at her but told Moses that she had her back turned when Defendant fired the gun. The Court finds that Slaughter's initial description of events is a more reliable account. She gave this account shortly after the altercation and was visibly distressed. That her statements were made under the stress of excitement bolsters the reliability of her account. *See Dobson*, 529 Fed. App'x. at 539 (holding the trial court

---

[2] The Court notes that a pending civil case in this district alleges that Investigator Moses made false statements and material omissions in a matter unrelated to this case. Case No. 16-cv-11593. These allegations have not yet been proved or disproved and, in any event, the Court finds Moses's testimony here to be credible, as her testimony on direct and cross-examination is corroborated by the exhibits submitted by the Government and Defendant.

reasonably inferred that a statement made an hour after the declarant was brutally beaten was reliable); *see also Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983) ("The excited utterance exception is based on the belief that the statement is reliable because it is made while the declarant is under the stress of excitement.").

On October 22, 2017, Defendant was arraigned in the 36th Judicial District Court in Detroit, Michigan. He was charged with assault with intent to do great bodily harm less than murder, discharging a firearm in or at a building, two counts of assault with a dangerous weapon (felonious assault), felony firearm, and domestic violence. Defendant pleaded not guilty and was released on bond with a condition to not have any contact with Slaughter. One month later, the charges were dismissed because Slaughter failed to appear in court. Defendant never notified his probation officer of his arrest or the criminal proceedings. This Court ordered issuance of a warrant for violations of the conditions of supervised release on November 28, 2017.

## CONCLUSIONS OF LAW

Under 18 U.S.C § 3583(e)(3), a district court may revoke a term of supervised release if it finds "by a preponderance of the evidence that the defendant violated a condition of supervised release." There are three grades of probation and supervised release violations:

> (1) Grade A Violations--conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment exceeding one year that (i) is a crime of violence, (ii) is a controlled substance offense, or (iii) involves possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a); or (B) any other federal, state, or local offense punishable by a term of imprisonment exceeding twenty years;
>
> (2) Grade B Violations--conduct constituting any other federal, state, or local offense punishable by a term of imprisonment exceeding one year;
>
> (3) Grade C Violations--conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less; or (B) a

6

violation of any other condition of supervision.

U.S.S.G. § 7B1.1(a)(1). Where there is more than one violation of the conditions of supervision, or the violation includes conduct that constitutes more than one offense, the grade of the violation is determined by the violation having the most serious grade. U.S.S .G. § 7B1.1(b).

## I. Defendant Committed Another Federal, State or Local Crime

The Government first alleges that Defendant violated his supervised release by committing another federal, state, or local crime. "A violation of this condition may be charged whether or not the defendant has been the subject of a separate federal, state, or local prosecution for such conduct." § 7B1.1, cmt. 1. The Court determines the grade of the violation "based on the defendant's actual conduct." *Id*.

In evaluating Defendant's conduct, his arraignment provides a useful guidepost. The arraignment alleged that Defendant committed felony crimes of violence–assault with intent to do great bodily harm less than murder and felonious assault–which are Grade A violations. A "crime of violence" includes state felonies that have "as an element the use, attempted use, or threatened use of physical force against the person of another." § 4B1.2. Unsurprisingly, under Michigan law, both assault crimes involve the element of assault, i.e., the use, attempted use, or threatened use of force and violence to do harm to another. *See People v. Bailey*, 549 N.W.2d 325, 331 (Mich. 1996); *United States v. Mosley*, 339 Fed. App'x. 568, 575 (6th Cir. 2009) (stating that one of the elements of felonious assault under Michigan law is "the use, attempted use, or threatened use of physical force against the person of another.").

The Government has proven by a preponderance of the evidence that Defendant committed a felonious assault. The elements of felonious assault are (1) an assault, (2) with a

7

dangerous weapon, (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery. *People v. Bosca*, 871 N.W.2d 307, 325 (Mich. Ct. App. 2015). During the altercation, Defendant wielded and brandished a knife, which is a dangerous weapon. M.C.L. § 750.82(1). He struck Slaughter with that knife, resulting in a severe laceration to her thumb. Whether Slaughter was attempting to block his strikes or attempting to grab the knife away from him is immaterial. At a minimum, by brandishing the knife Defendant threatened the use of force with the intent to place Slaughter in reasonable apprehension of an immediate battery, thereby committing a felonious assault. Therefore, the Court concludes that Defendant committed a Grade A violation of supervised release by committing another federal, state, or local crime that is a felony crime of violence.[3]

## II. Defendant Possessed a Firearm and Ammunition

Next, the Government alleges that Defendant violated his supervised release by possessing a firearm and ammunition. Because Defendant is a felon, it is a crime under federal and state law for him to possess any firearm or ammunition. 18 U.S.C. § 922(g)(1); M.C.L. § 750.224f. Possession of a firearm by a felon is a Grade B violation. *See* § 7B1.1, cmt. 5; *see also United States v. Webb*, 559 Fed. App'x. 704, 706 (10th Cir. 2014) ("Defendant's 2012 felon-in-possession conviction under § 922(g)(1) represents a Grade B violation.").

The Government has proven by a preponderance of the evidence that Defendant possessed a firearm and ammunition. Slaughter consistently stated that Defendant held a silver and black handgun and fired a shot. The same day as the altercation, the police recovered that

---

[3] Having so determined, it is unnecessary to determine whether the conduct underlying the first charged violation also constitutes other criminal offenses. *See* 7B1.1(b) ("Where . . . the violation includes conduct that constitutes more than one offense, the grade of the violation is determined by the violation having the most serious grade.").

gun and ammunition when they searched Defendant's residence. This evidence is sufficient to show that Defendant possessed a firearm and ammunition in violation of his supervised release. *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007). And because Defendant is a felon, this conduct constitutes a Grade B violation.

### III. Defendant Failed to Notify his Probation Officer of His Arrest

Finally, the Government alleges that Defendant committed a Grade C violation by failing to notify his probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer. The Government proved this violation by a preponderance of the evidence. Defendant's probation officer testified that Defendant never contacted him to report his arrest and the Court received no other evidence to the contrary. Therefore, the Court concludes that Defendant committed a Grade C violation of his supervised release.

### CONCLUSION

For the reasons above, the Court finds that the Government has established, by a preponderance of the evidence, that Defendant committed a Grade A, Grade B, and Grade C violation of supervised release. **The parties shall appear for sentencing in this matter on Friday January 12, 2017 at 11:00 a.m.**

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: December 27, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 27, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager